IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
Civil Action No.: 5:25-cv-38

| | | |
|---|---|---|
| MIL-COMM PRODUCTS COMPANY, INC., | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GREGORY COHEN; ENGINEERED MATERIALS, INC., | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff MIL-COMM Products Company, Inc. ("MIL-COMM"), by way of Complaint against Defendants Gregory Cohen ("Cohen") and Engineered Materials, Inc. ("EMI") (collectively, "Defendants"), hereby alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action by MIL-COMM against Defendants for, *inter alia*: (a) unauthorized use, disclosure, and/or wrongful misappropriation of confidential, proprietary, and trade secret information in violation of the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1832, *et seq.*) and the North Carolina Trade Secrets Protection Act (N.C.G.S. § 66-152, *et seq.*); (b) unauthorized use of confidential, proprietary, and trade secret information to compete at an unfair advantage in violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C.G.S. § 75-1.1., *et seq*.); and (c) tortious interference with business relations and business expectations.

## PARTIES

2. Plaintiff MIL-COMM is a corporation organized and existing under the laws of New Jersey, having its principal place of business at One Meadowlands Plaza, Suite 200, East

Rutherford, New Jersey 07073.  MIL-COMM is an entity with a legal existence in good standing in its state of incorporation and has the capacity to sue.

3. On information and belief, Defendant Cohen is a citizen of North Carolina who resides at 409 Westchester Road, Statesville, North Carolina 28265.

4. On information and belief, Defendant EMI is a corporation organized and existing under the laws of Florida, having its principal place of business at 1010 Salisbury Road, Statesville, North Carolina 28677.  EMI may be served with process upon its registered agent Northwest Registered Agent Service, Inc. at its registered office located at 4030 Wake Forest Road, Suite 349, Raleigh, North Carolina 27609.

5. On information and belief, Cohen is a Director, the President, the Treasurer, and the Secretary of EMI.

6. On information and belief, EMI also does business as Tetra Gun.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331, because MIL-COMM's claims against Cohen and EMI under the DTSA confer original jurisdiction to district courts of the United States.  MIL-COMM's additional claims fall within this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the claims are substantially related to the federal claims and there exists a common nucleus of facts among all claims.

8. This Court has personal jurisdiction over Cohen because he is a citizen of, resides in, and is domiciled in the State of North Carolina, and is located in this District.

9. This Court has personal jurisdiction over EMI because it maintains its principal place of business in the State of North Carolina, and more specifically in this District, and is therefore considered a resident.

10. Venue is proper in this judicial district under 28 U.S.C. § 1391 because both Defendants are residents of North Carolina and reside in this District and a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND
### MIL-COMM's History and Business

11. MIL-COMM is a global provider of extreme performance lubricants and cleaners for critical industrial, military, and consumer applications.[1]

12. MIL-COMM was founded in 1985 by retired U.S. Navy Gunnery Officer Robert G. Furlong of Montclair, New Jersey.[2] In 1999, MIL-COMM acquired ownership of intellectual property in the form of lubricant formulas and manufacturing processes developed by Tribophysics, Inc., a New Jersey corporation. MIL-COMM subsequently invested significant resources, time, and money to develop its products, create additional intellectual property, and qualify for critical U.S. military use approvals and authorizations that allow it to sell its products to the U.S. Department of Defense ("DoD"). MIL-COMM remains a family- and employee-owned business.

13. MIL-COMM supplies its products to all branches of the U.S. military, to more than 20 U.S.-allied militaries worldwide, and to leading defense industry customers.[3] MIL-COMM products are used by the U.S. military worldwide as critically relied upon maintenance materials

---

[1] INTRODUCING MIL-COMM PRODUCTS COMPANY, *available at*: https://mil-comm.com/wp-content/uploads/2018/11/INTRODUCING-MIL-COMM.pdf; ABOUT US, *available at*: https://mil-comm.com/about-us/.
[2] *See id.*
[3] *See id.*

for the gun systems of, *inter alia*, USAF F-16, F-22 and F-35 jet fighters as well as for use on more than 20 U.S. military artillery and heavy weaponry platforms. In addition, MIL-COMM's leading product, "TW25B®" synthetic grease, has been adopted for use by U.S. Special Forces globally. MIL-COMM spent significant resources securing 25 National Stock Numbers ("NSNs") that authorize MIL-COMM's products for DoD procurement. NSNs are issued by or through the DoD's Defense Logistics Agency ("DLA") and are a valuable asset for supplying products to the U.S. military. In its authorization approving MIL-COMM's products for system-wide adoption by the U.S. military, DLA designates and catalogs MIL-COMM lubricants as "sole source critical applications items."

14. TW25B® is a synthetic grease engineered for long-lasting lubrication protection and extreme pressure, heavy-load applications.[4] TW25B® reduces friction and wear on all working parts, penetrates metal surfaces and leaves a semi-dry film coating for smooth function and extended life of metal parts.[5] MIL-COMM markets TW25B® for use "wherever reliable, long-lasting performance is critical," including for "large wear surfaces, weaponry and gun parts, fast-moving gears, tightly fitted parts, valves, cables, bolt threads, hinges, doors, [and] conveyors."[6]

15. TW25B® consists of a secret, proprietary blend of materials that is manufactured using secret processes.

16. MIL-COMM manufactures and distributes TW25B®, as well as other products, from a factory and warehouse located at 1010 Salisbury Road, Statesville, North Carolina 28677.

---

[4] LEGENDARY TW25B®, *available at*: https://mil-comm.com/tw25b/.
[5] *Id.*
[6] *Id.*

4
Case 5:25-cv-00038-KDB-SCR     Document 1     Filed 03/19/25     Page 4 of 20

## MIL-COMM's Trade Secrets

17.     MIL-COMM has acquired and developed highly valuable proprietary and trade secret information, including information regarding the blends of materials and formulas used in its products (including TW25B®), the processes used to manufacture its products (including TW25B®), and supplier details (collectively, MIL-COMM's "Trade Secrets").

18.     MIL-COMM has taken and continues to take great measures to ensure that its Trade Secrets remain secret, protected, and unknown to any third parties, especially competitors. MIL-COMM chose to forego patent protection for its Trade Secrets to prevent them from entering the public domain via published patents or patent applications. It also expressly refuses to divulge its Trade Secrets to third parties that request such information, including the DLA. When it is necessary to conduct business with third parties related to its Trade Secrets, MIL-COMM safeguards them by requiring the third parties to execute confidentiality agreements before engaging in any such business. For example, when MIL-COMM entered into an agreement with a third party to manufacture MIL-COMM's products in North Carolina beginning in 2014, the agreement required the third party to "maintain and protect the confidentiality of all MIL-COMM trade secrets, including formulation and assembly processes; financial data; customer lists; business practices and plans." Subsequent manufacturing agreements between the two parties contain the same requirements.

19.     MIL-COMM's employee manual explicitly requires employees to protect and maintain the secrecy of MIL-COMM's Trade Secrets, stating:

> In the course of employment with the Company, employees may have access to "Confidential Information" regarding the Company, which may include its business strategy, future plans, financial information, contracts, suppliers, customers, personnel information or other information that the Company considers proprietary and confidential. Maintaining the confidentiality of this information is vital to the Company's competitive position in the industry and, ultimately, to its ability to

achieve financial success and stability. Employees must protect this information by safeguarding it when in use, using it only for the business of the Company and disclosing it only when authorized to do so and to those who have a legitimate business need to know about it. This duty of confidentiality applies whether the employee is on or off the Company's premises, and during and even after the end of the employee's employment with the Company.

20. MIL-COMM also employs physical measures to safeguard its Trade Secrets. For example, when MIL-COMM's products were manufactured in New Jersey, MIL-COMM used locks to restrict access to its manufacturing areas and prohibited public access, and the third party that currently manufactures MIL-COMM's products in North Carolina is similarly required to protect MIL-COMM's Trade Secrets as noted above.

### Cohen's Employment with MIL-COMM

21. Cohen was employed as Sales Manager at MIL-COMM from 2001 to 2005 and as Sales and Marketing Director from 2007 to 2014. During that time, when such information was needed for his job with MIL-COMM, Cohen had direct access to and learned in detail MIL-COMM's Trade Secrets.

22. In 2014, Cohen's position at MIL-COMM was eliminated when MIL-COMM moved its manufacturing and distribution from New Jersey to North Carolina, with formal notification provided to Cohen on January 21, 2014. After that time, Cohen had no authorization to use or disclose MIL-COMM's Trade Secrets.

### Cohen's Employment with FTI

23. After leaving MIL-COMM, Cohen was hired by one of MIL-COMM's competitors, FTI, Inc. ("FTI"), which did business as Tetra Gun.

24. On or about April 28, 2014, MIL-COMM sent a letter to the President of FTI, W. Brian Smith, to inform FTI that Cohen was knowledgeable about MIL-COMM's Trade Secrets and to warn FTI and Cohen to remain vigilant about any possible misuse of those Trade Secrets.

That letter, copies of which were sent to the CEO and in-house counsel for FTI's parent corporation, Troy Chemical, stated in part:

> We learned recently that former MIL-COMM employee Greg Cohen would be joining TETRA as a new employee. Greg should help you with his marketing, sales and operations experience, and I wish him well in his new position.
>
> It is also my obligation to inform you that both Greg personally and TETRA as a corporation should remain extremely vigilant about any possible misuse of information that is privileged and proprietary to MIL-COMM PRODUCTS COMPANY.
>
> According to our corporate counsel, Greg is obligated to abide by confidentiality provisions articulated in MIL-COMM's corporate policies and procedures manual published September 27, 2013, because Greg was an employee of MIL-COMM at that time. Common law also places limitations on what information a former employee may subsequently share with a competitor. Areas of possible concern include intellectual property/proprietary formulations and processes; lists of customers/clients and contact information; identity of key suppliers and products procured; price lists and other pricing or costing information; marketing history or plans; information about products and product development not in the public domain; unique product or packaging design – to name some of what could become a concern to us.
>
> … In defense of the best interests of our Company, we will be actively monitoring the activities of TETRA in the future, overt actions and any actions.

25. After sending the April 28, 2014 letter, MIL-COMM diligently monitored compliance by FTI and Cohen to the best of its ability.

### EMI's Incorporation, Relocation to 1010 Salisbury Road, and Use of MIL-COMM's Trade Secrets

26. On or around July 27, 2022, EMI was incorporated in Florida. The Articles of Incorporation, available on Florida's Division of Corporations website, identified Cohen as a Director, President, and Treasurer of EMI. Susan Cohen and Carol Cohen were identified as additional Directors. At the time, EMI's principal place of business was listed as 51 Agawam Drive, Wayne, New Jersey 07470.

27. On or around December 19, 2022, Cohen registered EMI in North Carolina. On that date, Cohen applied for a Certificate of Authority to transact business in North Carolina.

28. In or around 2023, EMI purchased or otherwise acquired the Tetra Gun business from FTI.

29. At some point in or prior to July 2024, EMI relocated its principal place of business to 1010 Salisbury Road, Statesville, North Carolina 28677. On July 17, 2024, EMI filed two Annual Reports in North Carolina, both identifying Cohen as the President of EMI and identifying 1010 Salisbury Road as its principal place of business. Similarly, on February 14, 2025, EMI filed a Reinstatement document in Florida that identified Cohen as a Director, President, Treasurer, and Secretary of EMI and identified 1010 Salisbury Road as its principal place of business.

30. As a result of EMI's relocation to 1010 Salisbury Road, its principal place of business is now the same building from which MIL-COMM manufactures and distributes its products.

31. On information and belief, in or around September 2024, EMI announced a new product, "OBEX Prime Grease."

32. On information and belief, Cohen and EMI misappropriated and continue to misappropriate MIL-COMM's Trade Secrets to develop and manufacture OBEX Prime Grease.

33. For twenty-five years prior, no other company or individual has been able to duplicate MIL-COMM's TW25B® or create or develop a product with similar properties or that had similar performance characteristics. TW25B® and the process to make TW25B® are extremely complicated and secret, and they cannot be readily ascertained through reverse engineering, independent derivation, or any other proper or lawful means.

34. An investigation by MIL-COMM, including extensive testing on OBEX Prime Grease conducted by a leading independent laboratory, supports the conclusion that Cohen and EMI used and continue to use MIL-COMM's Trade Secrets to develop and manufacture OBEX

8

Prime Grease. The independent laboratory's analysis, which was a complex endeavor that required significant effort and expense, indicates that the chemical structure of OBEX Prime Grease essentially duplicates the chemical design of MIL-COMM's TW25B® product, with only insubstantial differences.

35. Cohen and EMI have also unfairly benefited from knowledge gained by Cohen during his employment by MIL-COMM regarding MIL-COMM's key supplier relationships and their supply of unique chemical materials to MIL-COMM, including a uniquely engineered micro-particle that is essential to MIL-COMM's products.

36. On its website, blog, and social media websites, EMI markets or has marketed OBEX Prime Grease by equating it to and/or referencing MIL-COMM's TW25B® product. As an example, EMI's product page for OBEX Prime Grease on its website https://www.tetragundirect.com has instructed customers to "Compare [OBEX Prime Grease] to TW25B grease." *See, e.g.*, https://web.archive.org/web/20241212110029/https://www.tetragundirect.com/product-page/tetra-gun-obex-prime-grease.

37. On the website operated by EMI's distributor AGC Global Solutions, content has been plagiarized verbatim from MIL-COMM's website in an effort to present MIL-COMM's TW25B® grease and EMI's OBEX Prime Grease as being of equal utility and efficacy, of the same value, and therefore being interchangeable products.

38. On information and belief, EMI offers or has offered OBEX Prime Grease for sale at least through: Walmart; Amazon; AGC Global Solutions; its online store https://www.tetragundirect.com; through at least 15 other online stores, such as Midwayusa.com;

an undetermined number of brick-and-mortar retail locations; and at trade shows in the United States and internationally.

39. On information and belief, Defendants have solicited MIL-COMM's customers to replace TW25B® with OBEX Prime Grease. For example, Defendants are aware from the time of Cohen's employment by MIL-COMM that manufacturer SIG SAUER is one of MIL-COMM's leading customers. On information and belief, Defendants have solicited SIG SAUER product maintenance technicians to replace TW25B® grease with OBEX Prime Grease. *See, e.g.*, https://sigforum.com/eve/forums/a/tpc/f/150601935/m/2860033905.

40. On information and belief, Defendants have directly or indirectly submitted an application to the DLA seeking to make use of one of MIL-COMM's exclusively assigned and long-held NSNs (NSN: 9150-01-439-0858) for the purpose of co-opting current and future MIL-COMM sales to the U.S. military.

41. On information and belief, by way of their DLA application, Defendants have directly or indirectly claimed to the DoD that OBEX Prime Grease is equal or superior to MIL-COMM's TW25B® and should therefore be cataloged as such by the DLA, which would permit the military to procure OBEX Prime Grease in place TW25B®.

42. On information and belief, in statements in or related to Defendants' DLA application, Defendants have falsely claimed to the DoD that OBEX Prime Grease is superior to TW25B® in its performance attributes. Defendants' representations to the DLA, which MIL-COMM entirely disputes, negatively characterize TW25B® as having become inferior to OBEX Prime Grease and, as such, effectively rendered obsolete. Defendants' representations to the DLA are untrue and injurious.

43. On information and belief, in statements in or related to Defendants' DLA application, Defendants also incorrectly (i) represented that Cohen was "Vice President of Sales and Marketing" at MIL-COMM and that his responsibilities included "fulfilling DLA/SAIC orders," and (ii) referenced MIL-COMM's TW25B® product.

44. On January 22, 2025, MIL-COMM delivered a Cease-and-Desist letter to Cohen and EMI regarding the misappropriation of MIL-COMM's Trade Secrets. The letter requested that Cohen and EMI "immediately cease manufacturing, selling, or offering for sale products derived from MIL-COMM's intellectual property, including OBEX Prime Grease." Neither Cohen nor EMI have responded to the letter.

45. On information and belief, on January 31, 2025, nine days after receiving the Cease-and-Desist letter, Defendants filed a trademark application with the United States Patent and Trademark Office for "OBEX PRIME" after having packaged and marketed OBEX Prime Grease since at least July 2024. Defendants market OBEX Prime Grease with an ® (i.e., signifying that a trademark is registered with the U.S. Patent and Trademark Office ("U.S. PTO")) even though the U.S. PTO has not registered the trademark. *See, e.g.*, https://agcglobalsolutions.com/obex-prime.html.

46. MIL-COMM's current positions are based upon reasonable information and belief. MIL-COMM anticipates collecting additional evidentiary support through the discovery process. MIL-COMM reserves the right to add, including based on evidence uncovered during the discovery process, (i) additional claims against Cohen and EMI, and (ii) claims against presently unnamed individuals and companies, including for civil conspiracy.

# CAUSES OF ACTION

## COUNT I

**(Misappropriation of MIL-COMM's Trade Secrets in Violation of the DTSA, 18 U.S.C. § 1832, *et seq.*)**

47. MIL-COMM incorporates each of the preceding paragraphs as if fully set forth herein.

48. MIL-COMM owns, possesses, maintains, and defends its Trade Secrets, including information regarding the blends of materials used in its products (including TW25B®), the processes used to manufacture its products (including TW25B®), and supplier details. This information constitutes trade secrets under the DTSA.

49. MIL-COMM invested significant resources, time, and money into acquiring, developing, and defending its Trade Secrets, and that information is of immense value to MIL-COMM and critically important to its business.

50. MIL-COMM derives independent economic value from the fact that its Trade Secrets are not generally known to the public or other persons who could obtain economic value from their disclosure or use, and they are not readily ascertained through proper means. MIL-COMM's Trade Secrets cannot be learned by a competitor's observation or duplicated from public sources.

51. MIL-COMM has taken and continues to take reasonable efforts to safeguard and maintain the secrecy of its Trade Secrets, including without limitation (i) foregoing patent protection for its Trade Secrets to prevent them from entering the public domain via published patents or patent applications; (ii) expressly not divulging the Trade Secrets to third parties, including DLA, when asked for such; (iii) when necessary to conduct business with third parties related to its Trade Secrets, by requiring the third parties to execute confidentiality agreements before engaging in any such business; (iv) carefully screening and selectively qualifying parties

requesting access to MIL-COMM's product data and information; (v) the use of an employee manual requiring that its Trade Secrets be kept secret; (vi) the use of physical measures, such as locks, to safeguard its Trade Secrets; and (vii) informing Cohen's employers, after he left MIL-COMM and began working at FTI, that Cohen was knowledgeable about MIL-COMM's Trade Secrets and to warn FTI and Cohen to remain vigilant about any possible misuse of those Trade Secrets.

52. MIL-COMM's Trade Secrets relate to products used in, or are intended for use in, interstate commerce.

53. Cohen had a specific opportunity to acquire MIL-COMM's Trade Secrets for disclosure or use during his employment at MIL-COMM. MIL-COMM allowed Cohen to access its Trade Secrets during his employment for the limited purpose of furthering MIL-COMM's legitimate business interests. EMI had a specific opportunity to acquire MIL-COMM's Trade Secrets through its President and Director Cohen.

54. Cohen and EMI did in fact acquire, disclose, and/or use MIL-COMM's Trade Secrets without the express or implied consent and/or authority of MIL-COMM.

55. Cohen acquired MIL-COMM's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use, and Cohen knew or should have known he had a duty to maintain the secrecy of MIL-COMM's Trade Secrets as he knew the information was safeguarded by multiple protective measures as alleged herein and he knew he was bound by confidentiality provisions.

56. Defendants' misappropriation of MIL-COMM's Trade Secrets has directly and proximately caused and continues to cause MIL-COMM damages and irreparable injury, as set forth herein, including without limitation, diminution in value of the Trade Secrets.

57. Defendants' misappropriation is willful and malicious.

58. MIL-COMM will be irreparably harmed by Cohen and EMI's conduct through the loss of customers, goodwill, and competitive advantage in the industry.

59. MIL-COMM is entitled to injunctive relief to prevent Cohen and EMI from continuing to use MIL-COMM's Trade Secrets, including an injunction preventing Cohen and EMI from manufacturing, selling, or offering for sale products derived from MIL-COMM's Trade Secrets, such as OBEX Prime Grease.

60. MIL-COMM is entitled to damages for the loss caused by Cohen and EMI's misappropriation, as well as exemplary damages under 18 U.S.C. §1836(b)(3)(C) and reasonable attorney's fees under 18 U.S.C. §1836(b)(3)(D) because the misappropriation was willful and malicious.

## COUNT II
**(Misappropriation of MIL-COMM's Trade Secrets in Violation of the North Carolina Trade Secrets Protection Act, N.C.G.S. § 66-152, *et seq*)**

61. MIL-COMM incorporates each of the preceding paragraphs as if fully set forth herein.

62. MIL-COMM owns, possesses, maintains, and defends Trade Secrets, including information regarding the blends of materials used in its products (including TW25B®), the processes used to manufacture its products (including TW25B®), and supplier details. This information constitutes trade secrets under the North Carolina Trade Secrets Protection Act.

63. MIL-COMM invested significant resources, time, and money acquiring, developing, and defending its Trade Secrets, and that information is of immense value to MIL-COMM and critically important to its business.

64. MIL-COMM derives independent economic value from the fact that its Trade Secrets are not generally known to the public or other persons who could obtain economic value

from their disclosure or use, and they are not readily ascertained through proper means. MIL-COMM's Trade Secrets cannot be learned by a competitor's observation or duplicated from public sources.

65. MIL-COMM has taken and continues to take reasonable efforts to safeguard and maintain the secrecy of its Trade Secrets, including without limitation (i) foregoing patent protection for its Trade Secrets to prevent them from entering the public domain via published patents or patent applications; (ii) expressly not divulging the Trade Secrets to third parties, including DLA, when asked for such; (iii) when necessary to conduct business with third parties related to its Trade Secrets, by requiring the third parties to execute confidentiality agreements before engaging in any such business; (iv) carefully screening and selectively qualifying parties requesting access to MIL-COMM's product data and information; (v) the use of an employee manual requiring that its Trade Secrets be kept secret; (vi) the use of physical measures, such as locks, to safeguard its Trade Secrets; and (vii) informing Cohen's employers, after he left MIL-COMM and began working at FTI, that Cohen was knowledgeable about MIL-COMM's Trade Secrets and to warn FTI and Cohen to remain vigilant about any possible misuse of those Trade Secrets.

66. Defendants' acts of misappropriation occurred in North Carolina.

67. Cohen had a specific opportunity to acquire MIL-COMM's Trade Secrets for disclosure or use during his employment at MIL-COMM. MIL-COMM allowed Cohen to access its Trade Secrets during his employment for the limited purpose of furthering MIL-COMM's legitimate business interests. EMI had a specific opportunity to acquire MIL-COMM's Trade Secrets through its President and Director Cohen.

68. Cohen and EMI did in fact acquire, disclose, and/or use MIL-COMM's Trade Secrets without the express or implied consent and/or authority of MIL-COMM.

69. Cohen acquired MIL-COMM's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use, and Cohen knew or should have known he had a duty to maintain the secrecy of MIL-COMM's Trade Secrets as he knew the information was safeguarded by multiple protective measures as alleged herein and he knew he was bound by confidentiality provisions.

70. Defendants' misappropriation of MIL-COMM's Trade Secrets has directly and proximately caused and continues to cause MIL-COMM damages and irreparable injury, as set forth herein, including without limitation, diminution in value of the Trade Secrets.

71. Defendants' misappropriation is willful and malicious.

72. MIL-COMM will be irreparably harmed by Cohen and EMI's conduct through the loss of customers, goodwill, reputational damage, and competitive advantage in the industry.

73. MIL-COMM is entitled to injunctive relief to prevent Cohen and EMI from continuing to use MIL-COMM's Trade Secrets, including an injunction preventing Cohen and EMI from manufacturing, selling, or offering for sale products derived from MIL-COMM's Trade Secrets, such as OBEX Prime Grease.

74. MIL-COMM is entitled to compensatory damages for the loss caused by Cohen and EMI's misappropriation, punitive damages for Defendants' willful and malicious misappropriation, and reimbursement of attorneys' fees and costs.

## COUNT III
**(North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, *et seq.*)**

75. MIL-COMM incorporates each of the preceding paragraphs as if fully set forth herein.

76. Defendants have engaged in unfair methods of competition by using MIL-COMM's Trade Secrets to compete at an unfair advantage with MIL-COMM in the industry marketplace. Defendants' conduct, including without limitation, their acquisition, disclosure, and/or use of MIL-COMM's Trade Secrets and their tortious interference with MIL-COMM's business relations, is conduct in or affecting commerce within the meaning of N.C.G.S. § 75-1.1.

77. For all actions described throughout this Complaint, Defendants have acted unfairly and in a deceptive manner, most notably by using MIL-COMM's Trade Secrets without express or implied consent and/or authority from MIL-COMM and tortiously interfering with MIL-COMM's business relations.

78. Defendants' conduct, including without limitation, their acquisition, disclosure, and/or use of MIL-COMM's Trade Secrets and their tortious interference with MIL-COMM's business relations, was unfair and deceptive conduct proscribed by N.C.G.S. § 75-1.1.

79. Defendants' conduct, including without limitation, their acquisition, disclosure, and/or use of MIL-COMM's Trade Secrets and their tortious interference with MIL-COMM's business relations, was immoral, unethical, and unscrupulous.

80. Defendants' unfair and deceptive conduct as alleged herein has directly and proximately caused damage and irreparable injury to MIL-COMM, as set forth herein, including without limitation, diminution in value of the Trade Secrets.

81. MIL-COMM attempted to resolve this matter through a Cease-and-Desist letter, but Defendants have refused to respond or resolve the matter in any form.

82. MIL-COMM has suffered and continues to suffer damages as a direct and proximate result of Defendants' unfair and deceptive conduct in an amount to be proven at trial.

MIL-COMM is entitled to actual damages as well as treble damages and attorney's fees pursuant to N.C. Gen. Stat. §§ 75-16 and 16.1.

## COUNT IV
**(Tortious Interference with Business Relations and Business Expectations)**

83. MIL-COMM incorporates each of the preceding paragraphs as if fully set forth herein.

84. MIL-COMM maintains its business relationships with its customers, including the DLA, and it has had a longstanding, preexisting business relationship with the DLA for the past 26 years.

85. Based on that longstanding relationship and the fact that MIL-COMM has exclusively assigned and long-held NSNs, MIL-COMM has a valid and reasonable expectation that it would maintain its business relationship with the DLA, among others.

86. This relationship includes the DLA purchasing TW25B® from MIL-COMM.

87. Defendants know or had reason to know of MIL-COMM's business relationships with its customers, including the DLA. Despite this knowledge, Defendants have tortiously, maliciously, and unlawfully interfered and acted as a third-party intermeddler in MIL-COMM's business relationships by misappropriating Trade Secrets from MIL-COMM and have encouraged, induced, solicited, or attempted to induce MIL-COMM's customers to terminate or reduce their business with MIL-COMM and enter into a relationship with Defendants for products that have been and were expected to be provided by MIL-COMM. Defendants' actions were unlawful, do not constitute legitimate business competition and attempt to supplant MIL-COMM from selling products to the DLA, SIG SAUER, and other customers.

88. Defendants' tortious interference includes, but is not limited to, their attempts to have MIL-COMM's largest customer, the DLA, catalog OBEX Prime Grease as equal or superior

to MIL-COMM's TW25B® in an effort to have the military procure OBEX Prime Grease in place TW25B®. Defendants' tortious interference further includes, but is not limited to, Defendants' false representations to the DLA that OBEX Prime Grease is superior to TW25B® in its performance attributes.

89. Defendants' interference has caused and will continue to cause MIL-COMM damage. Defendants' interference is willful, malicious, and made with intentional disregard of MIL-COMM's rights, thereby entitling MIL-COMM to punitive damages.

90. As a result of Defendants' actions, MIL-COMM has been and will continue to be injured, in that it has and will continue to suffer damages and irreparable injury: (1) harm to business relationships with its customers, including the DLA and SIG SAUER, (2) harm to its reputation and goodwill, and (3) loss of customers and/or loss of revenues and profits.

## PRAYER FOR RELIEF

WHEREFORE, MIL-COMM respectfully requests the following relief:

1. Enter an injunction preliminarily and permanently prohibiting Cohen and EMI from manufacturing, selling, or offering for sale products derived from MIL-COMM's Trade Secrets, including OBEX Prime Grease;

2. Award MIL-COMM compensatory, exemplary, and punitive damages in an amount to be proven at trial;

3. Award MIL-COMM treble damages in accordance with N.C. Gen. Stat. § 75-16;

4. Award MIL-COMM its costs and attorneys' fees expended on this action, including attorneys' fees allowed under N.C.G.S. §§ 75-16.1, 66-154, and/or 18 U.S.C. § 1836;

5. Conduct a trial by jury on all issues so triable; and

6. Award such other and further relief, whether at law or in equity, as the Court deems just and proper.

Respectfully submitted this the 19th day of March, 2025.

/s/ Nicholas H. Lee
Nicholas H. Lee, N.C. Bar No. 47885
Parker Poe Adams & Bernstein LLP
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
nicholaslee@parkerpoe.com
Telephone: (704) 372-9000
Facsimile: (704) 334-4706

John D. Murnane (*pro hac vice* motion forthcoming)
Zachary L. Garrett (*pro hac vice* motion forthcoming)
Stephen Krachie (*pro hac vice* motion forthcoming)
VENABLE LLP
151 W. 42nd Street, 49th Floor
New York, NY 10036
Telephone: (212) 218-2100
Facsimile: (212) 307-5598
JDMurnane@Venable.com
ZGarrett@Venable.com
SKrachie@Venable.com

*Attorneys for MIL-COMM Products Company, Inc.*